[Civ. No. 41849. First Dist., Div. Two. Nov. 23, 1979.]

SANDRA K. KIRKLAND, Plaintiff and Respondent, v.
LOUIS RISSO et al., Defendants and Appellants.

**COUNSEL**

Alfred Nelson for Defendants and Appellants.

Crosby, Heafey, Roach & May, Mike C. Buckley and Carole D. Bergeron for Plaintiff and Respondent.

**OPINION**

**MILLER, J.**—Louis and Lloyd Risso appeal from that portion of the trial court's judgment which set aside, as against respondent, a deed of trust executed by trustor Louis Risso in favor of beneficiary Lloyd Risso covering certain real property located in the County of San Joaquin.

In a prior action, judgment was entered on July 16, 1974, in favor of respondent and against appellant Louis Risso for $635,165.35, the amount adjudged due and owing to respondent's assignor, John O'Neill, on a book account for hay, feed and other products dating back to 1949.

Respondent was unable to collect the judgment through the execution process due to claims made by appellant Lloyd Risso that he was now the owner of property formerly belonging to appellant Louis Risso. Respondent filed an action in San Mateo County to quiet her title to the real property and for fraudulent conveyance naming, *inter alia,* Louis and Lloyd Risso, the appellants herein.

The record reveals that respondent filed her original action on August 3, 1973 and served appellant Louis Risso on August 5, 1973. On August 20, 1973, appellant Louis Risso executed and recorded a trust deed on certain property in San Mateo County owned by Louis in favor of his brother, Lloyd. On September 18, 1973, another trust deed for property Louis owned in San Joaquin County was recorded in favor of Lloyd.

On July 8, 1974, a jury trial in the original action began in San Mateo County. According to testimony of Louis Risso in this action and statements of appellants' counsel, early that very same morning, Louis executed several documents assigning certain of his assets to his brother Lloyd. Appellants stipulated that the purpose of the transfers was to prefer Lloyd over all other of Louis' creditors.

On July 10, 1974, the jury returned a verdict for respondent and against Louis Risso. Five days later, Louis executed an "assignment of proceeds of sale of dairy products" directing Foremost Foods (the company buying Louis' milk) to pay the "entire proceeds" of "any dairy products heretofore or hereafter sold by me to Foremost Foods Company" to his brother Lloyd.

Shortly after receiving judgment against Louis, respondent proceeded to levy on these assets to collect the judgment. After each levy, appellant Lloyd Risso filed third party claims asserting a security interest in the assets of his brother Louis based on the assignments and interests described above.

On November 12, 1974, respondent filed the complaint in this action in an effort to collect on the earlier judgment. After the quiet title portions of the complaint were dismissed, the case proceeded to trial against Louis and Lloyd on the issue of whether the conveyances of the San Mateo and San Joaquin properties were fraudulent.

At the trial below, appellants contended that the transfer of the deed of trust was not fraudulent because a substantial sum of money was owed by Louis to Lloyd which provided a fair consideration for the transfer. Appellants produced evidence indicating that Louis owed Lloyd $287,000 for the purchase of cattle, plus interest over a 20-year period. They also asserted that Lloyd had advanced over $51,000 for payment of bills incurred by his brother and that Lloyd had paid substantial sums due on the first deed of trust covering the San Joaquin property.

Respondent contended that the aforementioned debts were illusory and were expressly excluded from the deeds of trust, that the payments on the deed of trust for the San Joaquin property, if actually made, were made voluntarily.

The trial judge found that respondent was a creditor of Louis at all relevant times, that Louis was insolvent at all relevant times, and that the transfer of the security interest in the San Joaquin property was fraudulent because it was made without fair consideration. The court found that fair consideration was given for the deed of trust on the San Mateo property, and hence it was not fraudulent. Thus, the only transfer at issue on appeal is the San Joaquin conveyance.

Appellants' briefs contain no statement of issues. They appear to be an attempt to retry the case. Their single assertion of trial error is that the trial court erred in rejecting the testimony of all the defense witnesses. We can only conclude that appellants' sole issue on appeal is that the judgment is not supported by the evidence.

The standards for the substantial evidence test are well settled. "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citations]. All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.'* (6 Witkin, Cal. Procedure, *supra,* § 249, at p. 4241.) All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], (italics in original.)

The trial court made three findings concerning the conveyance of the San Joaquin property from Louis to Lloyd as being fraudulent. In finding 5 it was stated that "[a]t the time of granting said lien and security interest on said real properties, the debts owed by LOUIS RISSO exceeded the assets owned by LOUIS RISSO, and he was insolvent." Finding 6 states, "[t]he conveyance by LOUIS RISSO to LLOYD RISSO of the beneficial interest in the deed of trust covering real property located in San Joaquin County, California, was made without fair consideration." Finding 8 states, "[a]t the time of receiving the beneficial interests in the two deeds of trust referred to in paragraph 3, LLOYD RISSO did not have the actual intent to defraud the creditors of his brother, LOUIS RISSO."

These findings are framed in terms of pertinent provisions of the Uniform Fraudulent Conveyance Act (Civ. Code, §§ 3439.01-3439.12.) The act provides two distinct grounds, set forth in different sections thereof (§§ 3439.04 and 3439.07), for finding a conveyance to be fraudulent as to creditors. (*Hansford* v. *Lassar* (1975) 53 Cal.App.3d 364, 374 [125 Cal.Rptr. 804].) We are not here concerned with section 3439.07, dealing with *actual* fraud, since the trial court determined that Lloyd had no actual intent to defraud Louis' creditors. Rather, we deal with section 3439.04,[1] the *constructive* fraud statute.

■ "In order to establish a conveyance as fraudulent under section 3439.04 of the Civil Code, it must appear that the transferor is insolvent at the time of the conveyance or will be rendered insolvent thereby *and* that the conveyance was made without a fair consideration." (*T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.* (1963) 214 Cal. App.2d 826, 842-843 [29 Cal.Rptr. 887], italics in original.)

A person is insolvent under the Uniform Fraudulent Conveyance Act "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." (Civ. Code, § 3439.02, subd. (a).) There does not appear to be any dispute in the present case over finding No. 5 concerning Louis' insolvency. Louis freely admitted his insolvency at all relevant times. The fact of the conveyance of the deed of trust on the San Joaquin property to Lloyd was also freely admitted.

---

[1]Section 3439.04 of the Civil Code states: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

It was stipulated that Louis intended to prefer Lloyd over other creditors. ■ Therefore, the only issue that remains is whether there was sufficient evidence to support the trial court's finding No. 6 that Louis' conveyance of the San Joaquin property to Lloyd was made without fair consideration.

Section 3439.03 of the Civil Code provides in pertinent part that "[f]air consideration is given for property, or obligation: (b) [w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained." ■ What constitutes a fair consideration is a question of fact (*Copple v. Lazzarevich* (1951) 108 Cal.App.2d 143, 146 [238 P.2d 612]), and must be determined from the standpoint of the creditor. (*Patterson v. Missler* (1965) 238 Cal.App.2d 759, 766 [48 Cal.Rptr. 215].)

■ The issue then arises as to which party, after insolvency has been proven, has the burden of proof concerning consideration. Appellants, citing *Peterson v. Wilson* (1948) 88 Cal.App.2d 617, 626 [199 P.2d 757, 6 A.L.R.2d 258] (overruled on other grounds in *Bargioni v. Hill* (1963) 59 Cal. 2d 121 [28 Cal.Rptr. 321, 378 P.2d 593]), strenuously assert that "[f]raud is never presumed, and the burden is on the creditor who seeks to avoid the transfer to both allege and prove inadequacy of the consideration. Conversely, the grantee is not required to either allege or prove the adequacy of the consideration."

The majority of California cases dealing with the Uniform Fraudulent Conveyance Act discuss the burden of proof for insolvency, rather than for fair consideration. In those cases solvency and not insolvency is presumed. (*Stearns v. Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 737 [53 Cal.Rptr. 482]; *Miller v. Keegan* (1949) 92 Cal.App.2d 846, 851-852 [207 P.2d 1073].) Most cases cited by respondent deal either with *actual,* as opposed to *constructive,* fraud or situations where there was a voluntary conveyance. Appellants are correct in their contention that we are not here dealing with a "voluntary conveyance."

However, section 3439.12 of the Civil Code directs, "This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those States which enact it." Accordingly, we

refer to the case law of other jurisdictions that have adopted the Uniform Fraudulent Conveyance Act.

Pennsylvania is another jurisdiction that has adopted the Uniform Fraudulent Conveyance Act (see Pa. Stat.Ann., tit. 39 §§ 351-363 (Purdon)), and Purdon's Pennsylvania Statutes Annotated, title 39, section 354 is identical to Civil Code section 3439.04.

In *Winter* v. *Welker* (E.D.Pa. 1959) 174 F.Supp. 836, 843, wherein a husband was in debt at the time of transfer of property to his wife, the court held that the burden was on the wife to show by clear and satisfactory evidence that at the time of the transfer, he was solvent or that she paid full consideration. (See also *United States* v. *West* (D.Del. 1969) 299 F.Supp. 661, 664-665, Delaware law dealing with conveyances between relatives.)

Similarly, in *United States* v. *St. Mary* (E.D.Pa. 1971) 334 F.Supp. 799, 804, the court stated: "A construction of 39 P.S. § 354 shows that certain principles are well settled within this controlling section of the applicable state law. When the conveyor is in debt at the time of the conveyance, the burden rests upon the grantee to establish by clear and convincing evidence that either the conveyor was solvent, Farmers Trust Company of Lancaster v. Bevis, 331 Pa. 89, 200 A. 54 (1938), and was by such conveyance not rendered insolvent; *or* that a fair consideration had been paid for the conveyance." (Italics added, see also, *Neumeyer* v. *Crown Funding Corp.* (1976) 56 Cal.App.3d 178, 188-189 [128 Cal.Rptr. 366].)

In accordance with these cases, we hold that since Louis was admittedly in debt at the time he conveyed the San Joaquin property to Lloyd, the burden rested with Lloyd to establish either that Louis was solvent at the time of the transfer, and by such transfer was not rendered insolvent, or that the conveyance was supported by fair consideration. Having conceded that Louis was insolvent at the time he executed the deed of trust, Lloyd had the burden of proving fair consideration for the conveyance.

■ In addition, although there is no presumption that transactions between close relatives are per se fraudulent (*Hughes* v. *Maciel* (1934) 138 Cal.App. 509, 512 [32 P.2d 688]), when such a confidential relationship is shown to exist, the parties are held to a fuller and stricter

proof of the consideration and the fairness of the transaction. (*Wood* v. *Kaplan* (1960) 178 Cal.App.2d 227, 230-231 [2 Cal.Rptr. 917].)

▇ Given these standards, we next view the evidence in the light most favorable to respondent.

Lloyd Risso testified that from July 10, 1943, to August 5, 1960, he sold a total of 1,039 cows to his brother Louis for a total price of $287,000, for which he never received payment. The deed of trust on the San Joaquin property recites an amount of $287,000, but Louis testified that he believed he owed his brother about $10,000 more, but chose to remain silent in order to gain the advantage. However, there is substantial evidence in the record which tends to refute the brothers' contention that there was fair consideration for the San Joaquin property.

First, in 1967, Louis filed a petition under chapter XI of the Bankruptcy Act and in that petition alleged that he owed Lloyd only $16,000.

Second, the evidence demonstrated that Lloyd never had the economic means to sell his brother $287,000 worth of cattle on credit.

Lloyd testified that his first sale of 112 cows to Louis on July 10, 1943, was composed of 75 cows he had acquired from his mother, Louise Risso, in 1941, and the balance from his own herd. The 75 cows acquired from his mother, according to Lloyd, were only a part of the approximately 120 cows which his parents owned during the 1930's. Albert Risso, the brother of Louis and Lloyd, testified that his parents owned no more than 38 cows, and by the end of the 1930's they owned no more than about 10 cows. Thus, in order to have the 120 cows claimed by Lloyd, Louis Risso would have had to have purchased more than 100 head between 1940 and 1941. Albert Risso testified that the financial condition of his parents was such that it would have been impossible for them to acquire 100 cows.

Lloyd testified that over the 17-year period he sold $287,000 worth of cattle on credit (amounting to an average of $18,000 per year) to Louis; he never filed federal or state income tax returns for the reason that he had no taxable income to report.

Assuming, as Lloyd testified, that he purchased baby calves at a nominal price, he was still faced with the cost of feeding and caring for these calves for the two- to three-year period between when they were bought and when they were sold as mature cows. This cost of raising that many calves would have to be substantial.

Thus, the inescapable conclusion from Lloyd's testimony is that it would be financially impossible for him to have reared approximately 1,000 cows and sold them on credit in that period of time to his brother.

To support their claims, Lloyd and Louis produced some rather crude bookkeeping records purportedly containing the alleged sales of cows. Both brothers testified that their proffered exhibits were not originals, but contained entries from prior records which had been destroyed. Given this evidence, the trial court could conceivably have concluded that the books were prepared together in order to authenticate the sales, and that their authenticity was highly questionable. The only other testimony produced by appellants to prove the sale of cows was given by several witnesses who had seen Lloyd taking cows to Louis but who had no knowledge of any terms or agreements between the brothers.

Lloyd also testified that he had expended approximately $51,000 to pay bills owed by Louis to third parties and that such advances of money constituted a debt for which he considered the San Joaquin trust deed security. On the other hand, he gave additional testimony that the $51,000 payment of Louis' debts was a separate deal and not included in the San Joaquin trust deed.

The subject deed of trust purports to secure "payment of the indebtedness evidenced by one promissory note...in the principal sum of $287,000 executed by Trustor in favor of Beneficiary or order." The deed contains no "dragnet" clause securing all obligations owed by the trustee to the beneficiary. (See, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) §4.19-4.22.) The San Joaquin deed contains only a future advances clause which states, "[p]ayment of such further sums as the then record owner of said property hereafter may borrow from beneficiary, *when evidenced by another note (or notes) reciting it is so secured*." (Italics added.) (Exhibit 4.)

Given the explicit recitation that the trust deed secures *one* promissory note of $287,000 and the absence of any additional notes

subsequently executed, the trier of fact could properly conclude that the San Joaquin trust deed was intended to secure the single alleged obligation of $287,000 and nothing more.

Similarly, Lloyd's alleged assumption of the $90,000 first deed of trust held by Prudential against the San Joaquin property, even if true, does not establish adequate consideration. The San Joaquin deed of trust recited that it was given as security for a certain obligation evidenced by a specific promissory note. It does not indicate that it was given as security for the assumption of the payment of the Prudential first deed of trust.

In light of the foregoing, we conclude that there is sufficient evidence to support the trial court finding that the transfer of the security interest in the San Joaquin property was made without fair consideration and, consequently, the deed was fraudulent.

Judgment affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied December 21, 1979, and appellants' petition for a hearing by the Supreme Court was denied January 17, 1980.