### In re CONSOLIDATED CAPITAL EQUITIES CORPORATION, Debtor.

Bankruptcy No. 388–37346–SAF–11.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

April 21, 1992.

---

John Eichman, Jenkens & Gilchrist, Dallas, Tex., for CCEC Asset Management Corp.

R. Terry Bell, Andrews & Kurth, L.P., Dallas, Tex., for Chemical Bank.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

In July 1985 Consolidated Capital Equities Corporation (CCEC) guaranteed a $50,-000,000 loan from Chemical Bank to Johnstown America Company (JAC) which JAC used in its leveraged purchase of CCEC. On December 2, 1988, CCEC filed a petition for relief under Chapter 11 of the Bankruptcy Code. Chemical filed a proof of claim as an unsecured creditor of CCEC based upon CCEC's guaranty, seeking $25,-395,781.25 plus costs and expenses. In October 1990 the court confirmed CCEC's Fourth Amended Plan of Reorganization which enables CCEC Asset Management Corporation (CAMC) to challenge Chemical's proof of claim.

In December 1990 CAMC filed an amended objection to Chemical's proof of claim, asserting that the guaranty underlying the proof of claim constituted a fraudulent conveyance. CAMC asserts that since the Chemical claim arises from a fraudulent conveyance, the claim must be disallowed. 11 U.S.C. § 502(d). CAMC has moved for partial summary judgment on four issues: (1) that New York, rather than California, law applies to its avoidance action, (2) that the guaranty obligation was incurred without fair consideration, (3) that CCEC's assets should be valued separately, rather than as a going concern, when determining CCEC's solvency on the date of transfer, and (4) that CCEC's primary assets had no fair, saleable value at that time. Chemical filed a cross-motion for partial summary judgment on the first and third issues.

On January 9, 1992, the court conducted a hearing on the parties' respective summary judgment motions. The allowance or disallowance of a claim against a bankruptcy estate constitutes a core matter over which this court has jurisdiction to enter final orders. 28 U.S.C. §§ 157(b)(2)(B) and 1334.

### Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and other matters presented to the court, together with the affidavits, if any, show that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Washington v. Armstrong World Industries Inc.,* 839 F.2d 1121 (5th Cir. 1988). On a summary judgment motion the inferences to be drawn from the underlying facts are to be drawn in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. A factual dispute bars summary judgment only when the disputed fact is determina-

tive under governing law. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The movant bears the initial burden of articulating the basis for its motion and identifying evidence which shows that there is no genuine issue of material fact. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The non-movant may not rest on the mere allegations or denials in its pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must determine the governing law. When the record taken as a whole and with inferences viewed in the light most favorable to the non-movant could not result in a judgment for the non-movant under governing law, summary judgment is appropriate.

### Factual Background

*Pre—LBO*

Prior to April 1985 CCEC was engaged in the business of raising money from investors through public real estate limited partnerships (RELPS) and real estate investment trusts (REITS). CCEC's headquarters and principal place of business were in California. The RELPs and REITs were all formed pursuant to, and governed by, California law and each had its principal place of business there. The majority of CCEC's employees and non-partnership assets were located in California. *Affidavit of Marvin T. Levin, Chemical Objection To CAMC Motion for Partial Summary Judgment and Cross Motion for Partial Summary Judgment (Chemical Cross-Motion ), Exhibit I.*

CCEC owned general partnership interests in twelve RELPs and sponsored and advised five REITs. *Stipulation and Order,* p. 4 and Exhibits 1–17. In exchange for managing the RELPs, managing the RELPs' property, and selling and acquiring partnership properties, CCEC typically received some or all of the following fees: partnership management fee, real estate brokerage commission, property management fee, subordinated incentive fee, and security brokerage fee. *CCP Partnership Agreement,* ¶ 2.04. In exchange for advis-

ing the REITs, procuring property or loans, or pledging or selling note receivables, CCEC typically received some or all of the following fees: advisory fee, acquisition fee, mortgage placement fee, incentive fee, mortgage pool brokerage fee, and compensation for additional services. *CCIOT/2 Advisory Agreement,* ¶¶ 10—15.

In 1982 CCEC established a banking relationship with Chemical, a New York banking association with its principal place of business in New York. Through CCEC Chemical became acquainted with JAC which managed most properties owned by CCEC's sponsored partnerships. In later years, JAC changed its name to The Consolidated Companies (TCC).

*The LBO*

In 1985 JAC acquired CCEC. On April 26, 1985, JAC and CCEC's Board of Directors executed an agreement which provided for JAC to purchase CCEC's common stock ("Acquisition Agreement"). The Acquisition Agreement was amended on June 24, 1985. Under the Acquisition Agreement, CCEC's tendering shareholders would receive (1) $63,700,000 in cash on or after the closing date, (2) the right to receive in the future $21,250,000, and (3) 425,-000 shares of convertible, redeemable, preferred, $10 par value JAC stock.

In May 1985 CCEC executed agreements to acquire interests in several corporate and partnership entities controlled by CCEC shareholders. *Form 8–K dated July 15, 1985,* p. 38, *Chemical Cross-Motion, Exhibit J.* These entities included Consolidated Capital Realty Corporation (CCRC), Consolidated Management Services Corporation (CMSC), and Consolidated Capital Securities Corporation (CCSC) which controlled a broker-dealer network. These entities were collapsed into CCEC effective July 1, 1985. *Id.*

JAC guaranteed several new and existing debts of CCEC. On June 28, 1985, JAC guaranteed CCEC's promissory note to Wells Fargo. *Exhibit A to Wells Fargo Proof of Claim, Chemical Cross-Motion, Exhibit A.* JAC's liability on the Wells Fargo note was contingent on the closing

of the transactions contemplated in the Acquisition Agreement. *Wells Fargo Guaranty*, p. 6. Also on June 28, 1985, Pacific Lighting Leasing Company executed a lease agreement with CCEC. JAC unconditionally and irrevocably guaranteed the lease payments. *Bank of America Guaranty, Chemical Cross–Motion, Exhibit B.*

On July 11, 1985, Chemical, JAC, and CCEC executed a loan agreement which provided that Chemical would loan $50,-000,000 to JAC to finance JAC's purchase of CCEC's stock. On July 15, 1985, Chemical loaned the $50,000,000 to JAC and JAC executed a $50,000,000 term note evidencing its indebtedness to Chemical. JAC was required to remit payments to Chemical in New York.

CCEC fully guaranteed JAC's term note to Chemical as required by sections 4(b) and 10 of the July 11, 1985, loan agreement. Nine existing JAC subsidiaries also guaranteed the loan.

On July 11, 1985, JAC executed an agreement pledging to Chemical (1) all issued and outstanding shares of CCEC stock, (2) all stock of Johnstown Management Company, and (3) all other assets of JAC. JAC also assigned to Chemical certain contract rights. JAC agreed that it would maintain CCEC with a minimum net worth of $15,-000,000. *Chemical Cross–Motion, Exhibit C, Exhibits A–1, 2, 3.*

The CCEC shareholders used the Chemical loan proceeds to retire a credit line of approximately $5,775,000 which Chemical had extended to CCEC. Chemical's summary judgment evidence suggests that CCEC's shareholders, and not CCEC itself, received the benefit of the advances from that line of credit. *Chemical Cross–Motion, Exhibit C, Exhibit A–4.* The evidence also suggests that the shareholders, and not CCEC, were to "retire" that debt. *Id.*

### Discussion

Under 11 U.S.C. § 502(d) "the court shall disallow any claim of any entity ... that is a transferee of a transfer avoidable under section ... 544 of this title, unless such ...

transferee has paid the amount, or turned over any such property...." The statute does not require that the transfer be avoided, only that it be "avoidable." Under § 544(b), a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 ..." CAMC contends that CCEC's guarantee to Chemical constitutes a voidable obligation under § 544(b). If so, Chemical's claim based on the voidable guarantee must be disallowed under § 502(d). CAMC filed a separate adversary proceeding, case no. 390–3881, to void the guaranty.

### A. Applicable State Law

Section 544(b) refers to avoidance under "applicable law." CAMC asserts that the court should apply New York law because the loan agreement provides that

All Notes and this Agreement shall be construed in accordance with and governed by the local laws of the State of New York applicable to contracts executed and to be performed in such State.

Chemical argues that this provision is inapplicable because CAMC's avoidance action does not sound in contract. Chemical contends that because California has the most significant relationship with the underlying transaction, its fraudulent conveyance law should apply. At the time of this transaction, both New York and California had adopted the Uniform Fraudulent Conveyance Act (UFCA).[1] However, the two states impose different burdens of proceeding on the substantive elements.

A suit to avoid a fraudulent conveyance is not a suit on a contract and is not governed by a contractual choice of law provision. *In re Morse Tool, Inc.,* 108 B.R. 384, 386–387 (Bankr.D.Mass.1989); *In re O'Day Corp.,* 126 B.R. 370, 391 (Bankr. D.Mass.1991) (fraudulent conveyance may occur pursuant to a contract and yet not be an action on the contract itself). The loan agreement provision for New York law does not control. The court must therefore

---

**1.** Effective January 1, 1987, California adopted the Uniform Fraudulent Transfer Act.

determine whether to apply New York law or California law.

■ Courts apply two different choice-of-law tests. A federal district court sitting in diversity would apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, bankruptcy courts have applied federal choice of law rules, known as the "independent judgment" test. *In re Holiday Airlines Corp.*, 620. F.2d 731, 733 (9th Cir. 1980). The Fifth Circuit has not decided which rule its constituent bankruptcy courts should apply. *See Woods–Tucker Leasing Corp. of Georgia v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir.1981).

Under the forum test, a Texas court would apply the most significant relationship analysis to a fraudulent conveyance action. *See Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979) (applying most significant relationship test in tort action); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984) (applying most significant relationship test in contract action). The independent judgment test is a multifactor, contacts analysis similar to that applied in Texas courts. *In re Kaiser Steel Corp.*, 87 B.R. 154, 157 (Bankr.D.Colo.1988) (the two tests are essentially synonymous); *Morse*, 108 B.R. at 385; *O'Day*, 126 B.R. at 390. Therefore, under either test the court must apply the law of that state with the most significant relationship to the transaction at issue.

■ On July 15, 1985, CCEC's headquarters, its principal place of business, the majority of its tangible and intangible assets, and the majority of its employees were all located in California. *Chemical Cross–Motion, Exhibit I.* CCEC and its Board of Directors participated in the underlying transactions from California. *See Kaiser*, 87 B.R. at 159. The greatest concentration of CCEC's creditors was in California. New York had fewer connections with the transaction. Chemical is located in New York; some portion of the loan agreement negotiations were conducted in New York; loan payments were to be remitted to Chemical in New York.

These undisputed facts show that California had the most significant relationship to the challenged obligation. Therefore, the court concludes that California law constitutes the "applicable law" to be applied under § 544(b).

## B. CAMC's Standing

■ CAMC requests a partial summary judgment that the guaranty obligation was incurred without fair consideration. In response, Chemical raises several threshold issues including standing under the California law and the applicability of that law to a leveraged purchase. Section 544(b) authorizes a "trustee" to avoid transfers. CAMC is not a trustee under § 544(b). Prior to plan confirmation CCEC, as a debtor-in-possession, held the powers of a trustee. 11 U.S.C. § 1107(a). CCEC could have pursued the § 544(b) avoidance cause of action. If meritorious, the guarantee would have been "avoidable" by CCEC. Under § 502(d), the court must inquire whether the guaranty is "avoidable." Chemical does not contend that CAMC lacks standing under § 502(d) to challenge the claim. The court need not determine on these summary judgment motions whether CAMC has standing to prosecute the adversary complaint to avoid the guaranty. The court's sole inquiry in this contested matter is whether the guaranty is "avoidable" thereby requiring disallowance of the claim.

But, even so, a debtor-in-possession may transfer a claim to a representative of its estate under the terms of a plan of reorganization. 11 U.S.C. § 1123(b)(3)(B). Under ¶ 5.1 of CCEC's confirmed plan of reorganization, CAMC, in effect, became the representative of the estate vested with the debtor-in-possession's cause of action under § 544(b). *In re Sweetwater*, 884 F.2d 1323, 1326 (10th Cir.1989); *In re Hunt*, 136 B.R. 437, 444–45 (Bankr.N.D.Tex.1991).

■ Section 544(b) of the Code requires that the obligation be avoidable under applicable law, here California law, by a creditor holding a bankruptcy allowable unse-

cured claim. Chemical argues that at the time of the guaranty, CCEC had no existing unsecured creditor for whom CAMC could assert a claim. CAMC asserts that Watergate Tower III Associates (Watergate) held a contingent claim on July 15, 1985, based upon a pre-existing lease which CCEC breached in 1988. Chemical concedes that Watergate, Bank of America, NTSA, BA Leasing & Capital Corp., and Wells Fargo had unsecured contingent liability to CCEC as of July 1985. *Chemical Cross–Motion, Exhibit I.* But Chemical asserts these do not constitute bankruptcy allowable unsecured claims.

Watergate and CCEC entered a lease in September 1983. CCEC's leasehold obligations to Watergate existed on July 15, 1985. At that date, Watergate held a contingent claim. A contingent claim may be allowable under the Bankruptcy Code. *See* 11 U.S.C. § 101(5)(A).

The California UFCA establishes that CAMC has standing to complain on Watergate's behalf. A creditor is a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." Cal.Civ.Code § 3439.01 (West 1970). An entity holding a contingent claim for damages is a creditor within the meaning of § 3439.01. *Allard v. DeLorean*, 884 F.2d 464, 466 (9th Cir. 1989); *Estate of Blanco*, 86 Cal.App.3d 826, 150 Cal.Rptr. 645, 648 (Ct.App. 2 Dist. 1978). As CCEC's lessor on July 15, 1985, Watergate had a contingent claim for future rents regardless of when a default occurred. A fraudulent transfer would diminish the pool of funds available to satisfy Watergate's contingent claim. A similar analysis applies to the Wells Fargo note and the Pacific Lighting lease. Therefore, CCEC had a creditor under § 544(b) and the California UFCA who could seek to avoid the Chemical obligation.

### C. Applicability of UFCA to LBOs

Chemical contends that the California fraudulent conveyance law should not be applied to the leveraged purchase of CCEC. Chemical asserts that the original Elizabethan fraudulent conveyance statutes did not contemplate undoing leveraged purchases. Moreover, JAC pledged its assets rather than CCEC's assets, as is customary in many leveraged purchases, and CCEC gave Chemical only an unsecured guaranty.

■ Under § 544(b), this court applies the California Uniform Fraudulent Conveyance Act (UFCA) and not Elizabethan statutes. The California UFCA provides that

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Cal.Civ.Code § 3439.04 (West 1970). The statute does not except conveyances or obligations under leveraged purchases. By its plain terms, the statute applies to "every conveyance" and "every obligation."

Nevertheless, Chemical claims that two courts have excluded leveraged purchase obligations from the reach of California's UFCA. *See Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); *Credit Managers Ass'n v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal. 1985). In *Kupetz* the leveraged buyout target guaranteed the acquiring company's loans which were paid to the target's two tendering shareholders. The court expressly contradicted Chemical's assertion, stating

... we should not be understood as insulating all LBOs from fraudulent conveyance laws ...

*Kupetz,* 845 F.2d at 850. The court found no fraudulent conveyance to the shareholders because (1) they had no actual intent to defraud creditors, (2) they were unaware of the purchaser's leveraging plans, (3) there were no presently existing creditors whose claims arose before the leveraged buyout closed, and (4) the leveraged buyout closely resembled a straight sale. 845 F.2d at 848. The court did not apply the elements of the California UFCA. But that court specifically instructed that the opinion not be read to exclude strict UFCA applicability. Nor could it, given the statute's plain language.

Similarly, the *Credit Managers* court expressly reserved the question whether the UFCA applied broadly to leveraged buyouts because the parties did not brief that issue. 629 F.Supp. at 181. The leveraged buyout in that case added a $1,200,000 lien against the target's warehouse and transformed an unsecured debt payable at ten percent interest to a secured debt payable at sixteen to twenty percent interest. Applying Cal.Civ.Code § 3439.05, not § 3439.04 which is applicable in this case, the court concluded that the transaction should not be set aside because while the target did not receive fair consideration, the target did not have unreasonably small capital following the conveyance. 692 F.Supp. at 182–83.

Neither the language of California's UFCA nor Chemical's cited authority excepts JAC's purchase of CCEC from California's UFCA. The statute is not ambiguous. It applies to "every obligation." The guaranty is an obligation. This court must apply the statute as written. *See King Ranch, Inc. v. U.S.*, 946 F.2d 35, 37 (5th Cir.1991); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1296 (3rd Cir.1986), *cert. denied, McClellan Realty Co. v. U.S.*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

### D. Fair Consideration

Section 3439.03 of the California UFCA provides:

> Fair consideration is given for property or obligation:
>
> a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property, or obligation obtained.

Cal.Civ.Code § 3439.03 (West 1970). What constitutes fair consideration is a question of fact. *Kirkland v. Risso*, 98 Cal.App.3d 971, 159 Cal.Rptr. 798, 801 (Ct.App. 1 Dist. 2 Div.1979).

Initially, the party seeking avoidance bears the burden of proof. *See Credit Managers*, 629 F.Supp. at 182–83 (assuming plaintiff must prove lack of fair consideration); *In re Curry & Sorensen*, 112 B.R. 324, 326 (9th Cir.BAP 1990). However, if the conveyor is in debt at the time of conveyance, the transferee must prove either the conveyor's solvency or that a fair consideration was paid. *Kirkland*, 159 Cal.Rptr. at 802; *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366, 373 (1976). Therefore, CAMC bears the burden of proving lack of fair consideration, unless it establishes a prima facie case of significant debt, in which case the burden would rest with Chemical to prove CCEC's solvency or that it paid CCEC a fair consideration for the guaranty.

Fraudulent conveyance analysis focuses upon what the debtor surrendered and what the debtor received. *O'Day*, 126 B.R. at 394; *Matter of Ohio Corrugating Co.*, 70 B.R. 920, 927 (Bankr.N.D.Ohio 1987). When analyzing the fairness of consideration the court assumes a creditor's perspective. *Kirkland*, 159 Cal.Rptr. at 801. Under the statute, the court must measure fair consideration by comparing property received by CCEC, whether directly or indirectly, and antecedent debts of CCEC satisfied with the obligation incurred.

Under the Bankruptcy Code's fraudulent conveyance section, § 548, conveyances to third parties which provide indirect, economic benefits to the debtor may be included in the court's analysis of fair consideration. *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir.1990); *Ohio Corrugating*, 70 B.R. at 927. However, as this court has explained, under § 548, the benefits "if not satisfying or securing a present or antecedent debt of the debtor, must be property. If property, it must appear on the debtor's balance sheet and be marketable." *In re First RepublicBank Corp. and IFRB Corp.*, Bench Ruling (Bankr. N.D.Tex. June 20, 1990, Felsenthal, J).

The California law's requirement of property or satisfaction of antecedent debt mirrors § 548(d)(2)(A). *See, by analogy, Matter of Holloway,* 955 F.2d 1008, 1010 (5th Cir.1992) (precedent by analogy to similar definitions under the Bankruptcy Code and Texas Fraudulent Transfer Act).

CCEC guaranteed a $50,000,000 loan from Chemical to JAC without receiving any proceeds from that loan. However, Chemical identifies six benefits which, it alleges, CCEC received in exchange for the guarantee:

1) a payoff of an existing CCEC line of credit with Chemical in excess of $5,000,-000;

2) the acquisition by CCEC of the assets of certain affiliated corporations as a result of the merger of these corporations into CCEC;

3) the execution of a $15,000,000 net worth guaranty from JAC;

4) the guaranty of certain of CCEC's more significant liabilities by JAC;

5) the receipt of certain equitable rights of indemnity, reimbursement, exoneration, subrogation, and contribution; and

6) the receipt of certain benefits resulting from CCEC's synergistic combination with JAC.

*Chemical Brief in Opposition to CCEC Summary Judgment,* p. 25. CAMC contends that CCEC received no consideration under the California law. The court must analyze the summary judgment evidence in the light most favorable to Chemical.

CCEC's liability on the guaranty may be offset by the value of its contribution rights. *Mellon Bank N.A. v. Metro Communications Inc.,* 945 F.2d 635, 648 (3rd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992).[2] While CCEC fully guaranteed the $50,000,000 loan, the summary judgment evidence shows that JAC pledged its assets and the assets of Johnstown Management Company. Nine other entities guaranteed the

loan. CCEC possessed certain equitable rights against JAC and its nine co-guarantors. CCEC projected that its liability on the Chemical loan based on the contribution rights ranged from $22,850,000 to $26,500,-000. *CAMC Answers and Objections to Chemical Bank's Third Set of Interrogatories,* p. 25–26. This comports with Chemical's proof of claim of $25,395,781.25. Considering this summary judgment evidence in the light most favorable to Chemical, CCEC could have valued these contribution rights up to $27,150,000 or considered its actual guaranty liability as low as $22,850,000.

Some CCEC shareholders used part of the proceeds from the Chemical loan to JAC to retire a CCEC line of credit from Chemical in the approximate amount of $5,775,000. The evidence does not establish whether CCEC or the shareholders were ultimately liable for retiring that debt. However, considering this evidence in the light most favorable to Chemical, that retirement satisfied an antecedent debt of CCEC.

■ JAC executed a guaranty to maintain CCEC's net worth at not less than $15,000,000. Chemical contends that this benefit constitutes consideration to CCEC for the guaranty under the California statute. Referring to the deposition of Jorge Russe, a Chemical officer, CAMC asserts that JAC could not perform. This guaranty was executed in favor of Chemical and not CCEC. Chemical offered no summary judgment evidence that CCEC could invoke the guaranty on its own behalf. Even if a benefit, whether direct or indirect, the JAC guaranty must have measurable property value or result in the satisfaction of debt under § 3439.03(a).

JAC guaranteed the Wells Fargo note and Pacific Lighting lease. Chemical contends that this benefit constitutes consideration to CCEC for the guaranty. CCEC's books reflected liability to both Wells Far-

---

**2.** The California UFCA directs that it "shall be so interpreted and construed as to effectuate its general purpose: to make uniform the law of those states which enact it." Cal.Civ.Code § 3439.12 (West 1970). *See Neumeyer,* 128 Cal.

Rptr. at 372–73 (comparing New York, Pennsylvania, and Maryland law); *Kirkland,* 159 Cal. Rptr. at 802 (comparing Pennsylvania and Delaware law).

go and Pacific Lighting. JAC did not pay that liability. JAC did not satisfy CCEC's antecedent debts. Chemical did not produce summary judgment evidence of value to the JAC guaranty to do so.

Chemical asserts that CCEC received benefit from its synergistic combination with JAC. The Russe deposition identifies benefits to CCEC from its relationship to JAC. However, Chemical produced no summary judgment evidence to reflect any property value to CCEC or satisfaction of debt resulting from these benefits. Chemical has not shown that CCEC's assets increased in value by its relationship with JAC. An expectation of future unmeasurable benefits not yet reflected as assets by CCEC does not constitute property under § 3439.03(a).

Chemical contends that the assets of certain subsidiaries acquired through the leveraged purchase constitutes property. The parties inadequately explained the circumstances surrounding the May 1985 "collapse" into CCEC of several entities owned by CCEC shareholders. CCEC acquired all the interests of, or succeeded by merger to, several partnership and corporate entities owned by CCEC shareholders. In support of CAMC's partial summary judgment motion, CAMC offered the deposition testimony of Marianna Grandin and Jorge Russe, both Chemical officers, who could not articulate value for CCEC. Chemical has provided no summary judgment evidence to determine the terms and net effect of the "acquisitions." Chemical has presented no summary judgment evidence that the "collapse" constituted consideration for CCEC's guaranty.

Any benefit of this collapse must result in a measurable property value to CCEC, such as an asset ownership, enhancement of the value of an asset or equity in a subsidiary, to come within the consideration factors of property or satisfaction of debt under § 3439.03(a). On summary judgment, the court must consider the actual summary judgment evidence in the light most favorable to Chemical. Rule 56(e) provides in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

"The very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial." *Richard v. Credit Suisse*, 242 N.Y. 346, 152 N.E. 110 (N.Y.1926) (Cardozo, J.).

In its response to CAMC's request for a partial summary judgment finding of no fair, saleable value of the broker-dealer network under the insolvency test, Chemical produced the affidavit of Donald A. Erickson that the broker-dealer network had value as a separate asset from CCEC as a going concern. *Chemical Cross–Motion, Exhibit F.* As part of the collapse, CCSC, which owned the broker-dealer network, was merged into CCEC. The Erickson affidavit refers to an Arthur D. Little, Inc., valuation report. With a motion to file a reply brief, Chemical submitted the report. The court granted the motion. The report constitutes hearsay evidence of the value of the broker-dealer network in 1985. On the day after the hearing on the partial summary judgment motions, Chemical filed a supplement to the summary judgment record containing the affidavit of James F. White who was the project manager of the Little valuation project. For summary judgment purposes, the White affidavit would overcome a hearsay objection to the Little valuation project. CAMC objected to the supplement on the basis of hearsay and on weight to be given to the affidavit. CAMC did not object on timeliness grounds. For summary judgment purposes, the court overrules the objection. Chemical argues that the valuation report assessed the value of the broker-dealer net-

work in 1985 at $33,000,000. Without the report, Chemical's only summary judgment evidence establishes "value" for the broker-dealer network as a separate asset to counter CAMC's contention of no value for insolvency analysis purposes. Other than the report, Chemical offered no summary judgment evidence of an amount of value for analysis of fair consideration. Evidence of value to counter an argument of no value does not provide the court with an amount for a fair consideration assessment.

■ Thus, if the court did not consider the White affidavit and the report, construed all the other summary judgment evidence in the light most favorable to Chemical, and resolved all the other factual issues in Chemical's favor, two alternative measurements result, neither of which constitutes fair consideration. Under the first, CCEC received a package of contribution rights valued at $27,150,000 and obtained the satisfaction of an antecedent debt of $5,775,000, for a total of property and debt satisfaction of $32,550,000, in exchange for a $50,000,000 obligation. That does not meet a threshold test for fair consideration. *See, by analogy, Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980) (setting a 70% threshold under the similar test of 11 U.S.C. § 548).

Under the second approach, courts analyzing the UFCA would offset the liability by the contribution rights. Applying that analysis, CCEC's net liability in 1985 to Chemical would have been $22,850,000. The transaction resulted in the satisfaction of the $5,775,000 debt. Under this approach, which appears to be the approach most often used by courts applying UFCA, CCEC received only $5,775,000 consideration for $22,850,000 debt; not fair consideration.

This result on summary judgment would be inconsistent with the genuine issue of material fact in dispute. The White affidavit allows the Little report to be introduced as summary judgment evidence. That evidence demonstrates specific facts showing a genuine issue for trial. The purpose of the summary judgment procedure is ful-

filled by focusing on the genuine and substantial dispute over fair consideration. Accordingly, the court holds that the record should be supplemented with the White affidavit and through it, the court should consider the Little valuation. Based on that summary judgment evidence, Chemical might be credited with an additional value through the acquisition of a corporation owning a broker-dealer network valued by the Little report at $33,000,000. With this additional factor, the court must conclude that there is a genuine issue of material fact of fair consideration. For this reason, the court will deny CAMC's partial summary judgment motion that the guaranty obligation was incurred without fair consideration.

E.   Insolvency

■ If the guaranty lacked fair consideration, it would be avoided if CCEC was insolvent or was rendered insolvent by the guaranty. Under California law

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

Cal.Civ.Code § 3439.02 (West 1970). The burden of proving insolvency generally rests upon the party seeking to avoid the obligation. *Curry & Sorensen,* 112 B.R. at 328. However, if CAMC establishes that CCEC had significant pre-obligation debts, Chemical would have the burden of proving (1) CCEC's solvency at the time of the guaranty or that CCEC was not rendered insolvent by the guaranty or (2) that CCEC received fair consideration. *Tri–Continental Seasing Corp., Inc. v. Zimmerman,* 485 F.Supp. 495, 499 (N.D.Cal.1980); *Kirkland,* 159 Cal.Rptr. at 802.

The California statute directs the court to determine "the present fair saleable value" of CCEC's assets at the time of the guaranty. In its motion for partial summary judgment CAMC contends that "present fair saleable value" means the aggregate liquidation value of CCEC's individual assets on the date of the obligation. *Tri–Continental,* 485 F.Supp. at 499–501;

*In re Franklin National Securities Litigation*, 2 B.R. 687, 710 (E.D.N.Y.1979), *aff'd, Corbin v. Franklin National Bank*, 633 F.2d 203 (2nd Cir.1980). In its cross-motion Chemical contends that measuring CCEC's going concern value, potentially yielding a greater figure, would be the more appropriate method. *In re Vadnais Lumber Supply Inc.*, 100 B.R. 127, 131 (Bankr.D.Mass.1989); *Moody v. Security Pacific Business Credit Inc.*, 127 B.R. 958, 995 (W.D.Pa.1991).

■ Contrary to Chemical's position, the statute requires the valuation of CCEC's assets, not the valuation of CCEC. CCEC as a going concern entity is not the statutory test. However, contrary to CAMC's position, liquidation value of CCEC's assets is not the test either. Rather, the court must determine the value of CCEC's assets if the assets were individually sold with reasonable promptness in arms-length transactions in an existing and not theoretical market at the time of the guaranty. *U.S. v. Gleneagles Investment Co.*, 565 F.Supp. 556, 578 (M.D.Pa.1983), *aff'd in part, remanded in part, U.S. v. Tabor Court Realty (Gleneagles Appeal)*, 803 F.2d 1288, 1304 (3rd Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

This definition comports with the traditional UFCA insolvency test: whether the conveyor has the present ability to meet existing and imminent debts as they mature. *See U.S. v. St. Mary*, 334 F.Supp. 799, 802 (E.D.Pa.1971); *Glenmore Distilleries Co. v. Seideman*, 267 F.Supp. 915 (E.D.N.Y.1967). Section 3439.02 also requires that the solvency analysis consider probable liability for existing debts as they become absolute and matured. The court must therefore assume that demand had been made on the full guaranty in July 1985. The court must also assume that any other liability has become absolute and matured. To have been solvent, CCEC must have been able to sell its assets at arms length in market sales in July 1985 to pay its debts, including the $50,000,000 guaranty. A fair saleable price for an asset would ordinarily include a component of capitalized, projected earnings which that asset could later generate.

*Kupetz v. Continental Illinois Nat'l Bank and Trust Co.*, 77 B.R. 754 (C.D.Cal. 1987), *aff'd sub. nom, Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988), does not compel a different conclusion. Although the district court questioned an expert's valuation of a company using a liquidation rather than going concern value, the district court was addressing whether the transferor had unreasonably small working capital under § 3439.05, and was not addressing insolvency under § 3439.04. 77 B.R. at 763. Moreover, the Ninth Circuit did not rely on, and even questioned, the district court's analysis on this issue. 845 F.2d at 851.

In its motion for partial summary judgment, CAMC seeks to establish that the following CCEC assets had no fair saleable value at the time CCEC incurred the guaranty obligation: (1) CCEC's interests in the RELPs, (2) CCEC's interests in the REITs, (3) CCEC's "broker-dealer network," and (4) CCEC's good will.

CAMC contends that CCEC's partnership interests in the RELP's had no fair saleable value because the RELPs income stream was contingent upon future efforts by CCEC. CAMC also asserts that the management interests constituted unassignable personal service contracts or agencies. CAMC relies primarily upon the contractual terms of the RELP management agreements and its analysis of California law.

Similarly, CAMC contends that CCEC's advisory interests in the REITs had no fair saleable value because they represented merely contingent future income streams. CAMC presented the deposition testimony of John Doyle that no third party would purchase CCEC's advisory interest in a REIT unless it had control of that REIT's board of trustees. *Deposition of John Doyle on October 9, 1991*, p. 63–70. CAMC cited the REIT advisory agreements and its analysis of California law.

Chemical responds with summary judgment evidence that CCEC's interests in the RELPs were sold by CCEC's bankruptcy estate on or about October 23, 1990, for

approximately $6,000,000. *Deposition of John Doyle on October 8, 1991*, p. 14–15. Chemical points to Mr. Doyle's testimony that $35,000,000 was an accurate valuation of CCEC's REIT and general partner interests on July 15, 1985. *Doyle Depositions* at p. 62. Although CAMC challenges whether affiants should be considered experts, Chemical presents affidavits of Donald Erickson of Ernst & Young and Lee Errickson opining that CCEC's interest in the RELPs and REITs could be sold separately from CCEC. *Chemical Cross-Motion, Exhibits F, H.* The court takes judicial notice of a settlement in adversary no. 389–3180 resulting in some cash value to CCEC from its interests in the REITs. Based on this conflicting summary judgment evidence, CAMC has not established that there is no genuine issue of material fact that CCEC's interests in the RELPs and REITs had no fair saleable value.

CAMC contends that the network of brokers and dealers who sold RELP and REIT interests to the public had no fair saleable value for solvency analysis. CAMC asserts that the broker-dealer network constituted a mere "customer list" if sold apart from CCEC as a going concern. *Deposition of Donald Erickson*, p. 172–75; *Deposition of John Doyle*, at p. 52–57. CAMC assets that no contractual relationship existed between CCEC and the brokers or dealers. *Id.* Finally, CAMC contends that the broker-dealer network would belong to CCEC's affiliate CCSC, and not to CCEC itself. *Erickson Deposition* at 218.

As discussed in the fair consideration analysis, Chemical presented summary judgment evidence that the broker-dealer network had value as a separate asset apart from CCEC as a going concern. *Erickson Affidavit.* Chemical also presented evidence that CCSC, which CAMC concedes owned the broker-dealer network, was merged into CCEC effective July 1, 1985. *Chemical Cross-Motion, Exhibit J*, p. 38. Chemical argues in its pleadings that its due diligence work in anticipation of making the JAC loan revealed that the broker-dealer network was worth over $33,000,000 in May 1985 based on the Little valuation report.

There is a genuine issue of material fact concerning the saleable value of CCEC's broker-dealer network. While CAMC's evidence suggests that the network was non-contractual and may have constituted only a customer list, that does not establish a lack of value. Moreover, Chemical's evidence suggests that the network has value as a separate asset and, as discussed above, argues the magnitude of that value. There is a triable fact dispute about the value of the customer list if sold by CCEC.

CAMC also seeks summary judgment that CCEC's "unidentified goodwill" had no fair saleable value on July 15, 1985. CAMC presents evidence that this asset was a "plug figure" used on CCEC's valance sheet to equalize assets and liabilities. *Erickson Deposition*, at 174–175. CAMC argues that, as a matter of law, goodwill can have no fair saleable value.

Chemical contends that "unidentified goodwill" constitutes a premium over the value of all individual assets including the CCEC name. *Erickson Affidavit.* Chemical disputes that the goodwill had no value because the CCEC reputation had value. *Id.*

As a separate asset, CCEC's goodwill could not have been sold in a market. If CCEC's name enhanced the value of an asset in the marketplace, the marketplace price of that asset would include that factor.

■ There are genuine issues of material facts necessitating a trial on the fair saleable values of CCEC's interest in the RELPs, CCEC's interests in the REITs and CCEC's broker-dealer network. CCEC's good will had no fair saleable value as a separate asset.

## CONCLUSION

The California Uniform Fraudulent Conveyance Act applies. Under that act, there is a genuine issue of material fact of whether CCEC received fair consideration for its guaranty of Chemical's loan to JAC to finance JAC's leverage purchase of CCEC. Under the California law, the court

must determine the fair saleable value of each one of CCEC's assets, not CCEC's going concern value, for purposes of assessing CCEC's solvency at the time it incurred the guaranty obligation. The court must conduct a trial on the fair saleable value as of July 15, 1985, of CCEC's interests in the RELPs and REITs and CCEC's broker-dealer network.

CAMC shall have the burden of proof under the California UFCA unless CAMC establishes at trial that CCEC had significant debt on July 15, 1985.

Based on the foregoing,

IT IS ORDERED that CAMC's motion for partial summary judgment is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Chemical's cross-motion for partial summary judgment is GRANTED in part and DENIED in part.