In re PROFESSIONAL INVESTORS INSURANCE GROUP, INC., Debtor.

Professional Investors Insurance Group, Inc., Plaintiff,

v.

United Overseas Bank (Luxembourg), S.A., Defendant.

Bankruptcy No. 397–34575–SAF–11. Adversary No. 397–3289.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Feb. 4, 1999.

---

\* Neither party contends that any provision or term of the MIP Order is ambiguous.

Paul Keiffer, Hance, Saporous, Wright, Dallas, TX, for plaintiff.

Steven T. Holes, Worship, Forsythe & Wooldridge, Dallas, TX, and Martin G. Bunin, Thelan, Reid & Priest, New York City, for defendants.

### *MEMORANDUM OPINION AND ORDER*

STEVEN A. FELSENTHAL, Bankruptcy Judge.

United European Bank, formerly United Overseas Bank–Luxembourg S.A., filed a proof of claim in the bankruptcy case of Professional Investors Insurance Group, Inc., (PIIGI), for $1,807,211.56, secured by a security interest in 1,100,000 shares of common stock of United Republic Life Insurance Company (URLIC) owned by PIIGI. The URLIC stock is property of the bankruptcy estate. PIIGI objected to the claim and filed this adversary proceeding to avoid the lien on the stock. On October 21, 1998, the parties jointly tried in this adversary proceeding the allowance of the claim and the validity of the lien.

The allowance of claims and the avoidance of liens on property of a bankruptcy estate are core matters over which this court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(B) and (K) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

On November 3, 1986, pursuant to a promissory note, UEB–Luxembourg loaned $6,500,000 to PIIGI. As collateral for payment of the note, PIIGI executed a loan and security agreement dated November 3, 1986, granting the bank a security interest in, among other things, the 1,100,000 shares of URLIC stock and 1,000 shares of capital stock in Professional Investors Life Insurance Company. Upon execution of the security agreement, the bank took possession of the URLIC stock and continues in possession of the stock.

The note was due on the date of the closing of a proposed offering of securities in PIIGI stock on February 3, 1987, but the note provided that its due date could be extended to September 30, 1987. PIIGI did not complete the public offering on February 3, 1987, and requested an extension of the note. The bank granted that extension. On November 1, 1988, the bank and PIIGI agreed to renew and extend the note to November 4, 1989. PIIGI made a series of payments reducing the principal balance of the note to $3,000,000 on November 6, 1989.

Beginning February 7, 1990, the bank sent PIIGI advices containing one month maturities for the note. The last advice, dated May 4, 1990, stated a final maturity of June 7, 1990. On June 6, 1990, the bank confirmed additional payments reducing the principal balance to $2,750,000 with a final maturity date of August 6, 1990. PIIGI made additional payments on December 26, 1990, and February 5, 1991. But on April 11, 1991, the bank sent PIIGI a letter declaring the loan and security agreement in default with the note immediately due and payable.

On July 23, 1992, PIIGI and the bank executed a written agreement. PIIGI agreed to pay the bank $1,600,000 in exchange for a release by the bank of its security interest in the stock of Professional Investors Life Insurance Company. PIIGI agreed that all remaining collateral

held by the bank securing the loan agreement would continue to secure PIIGI's obligations to the bank under the note and security agreement. But the July 1992 agreement further provided that it constituted the entire agreement between the parties with respect to its subject matter, superceding and replacing all prior agreements and understandings between the parties with respect to the subject matter.

On November 18, 1994, URLIC was placed into liquidation proceedings pursuant to an order of the Third Judicial District Court in Salt Lake County, Utah. *In re United Republic Life Insurance Company in Liquidation,* civil no. 930905380AA (3rd Dist. Salt Lake Co. Utah). The bank filed a proof of claim in the URLIC liquidation as the pledgee of the URLIC stock, but the Utah court denied the claim as contingent.

On April 3, 1996, Davister Corporation, a creditor of PIIGI, sued the bank and PIIGI in Texas state court seeking a declaration that if debt was due to the bank, PIIGI and not URLIC was liable for that debt. Davister also brought several tort claims based on the bank's filing of the proof of claim in the URLIC liquidation proceeding. *Davister Corp. v. United Overseas Bank (Luxembourg) S.A., United Overseas Bank (Geneva) S.A., and Professional Investors Insurance Group. Inc.,* no. 96–03330–I (Texas District Court of Dallas County 162nd Jud.Dist.). On April 29, 1997, the bank notified PIIGI that it intended to foreclose its security interest in the URLIC stock by public auction on May 20, 1997. On May 7, 1997, the bank filed an amended answer and cross-claim against PIIGI in the Texas action seeking to enforce its right to payment of the outstanding debt. On May 19, 1997, the Texas court refused to temporarily restrain the foreclosure sale.

On May 20, 1997, PIIGI filed its petition for relief under Chapter 11 of the United States Bankruptcy Code. The bank filed a proof of claim in the PIIGI case for an outstanding balance of $1,807,211.56, secured by the URLIC stock. On January 12, 1998, this court entered an order establishing the value of the stock at $615,000.

PIIGI contends that under Texas law limitations barred the bank's suit on the note and on the July 1992 agreement, thereby requiring that the claim be disallowed. The bank counters that New York law governs, making the suit on the note and the agreement timely. The bank contends that under New York law the July 1992 agreement constitutes an acknowledgment of the debt, and, further, when coupled with subsequent acts of PIIGI, amounts to an extension of the note. PIIGI asserts that the July 1992 agreement does not amount to an acknowledgment of the debt, much less an extension of the note. PIIGI further contends that with a disallowed claim, the lien on the URLIC stock must be voided under 11 U.S.C. § 506(d). The bank maintains, however, that it retains a contractual right to proceed against the stock, giving it a claim against property of the estate sufficient to defeat PIIGI's avoidance action under § 506(d).

The court addresses the limitations issue and then the lien issue. For the limitations issue, the court first determines whether the July 1992 agreement constitutes an acknowledgment of the debt or an extension of the note, or neither. The court then analyzes limitations under the laws of New York, Oklahoma and Texas. The court concludes its analysis of the limitations issue by determining which law to apply.

## Limitations

 Sections 501 and 502 of the Bankruptcy Code and Bankruptcy Rule 3001 provide that "a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets." *In re Fidelity Holding Co., Ltd.,* 837 F.2d 696, 698 (5th Cir.1988). The claimant will prevail unless a party who objects to the proof of claim produces evidence to rebut the claim. *Id.* Upon

production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence. *Id.* Accordingly, the bank's proof of claim as a secured claim is prima facie valid, unless PIIGI produces evidence to rebut the presumption.

The bank brought its cross-claim against PIIGI in Texas on May 7, 1997. If the July 1992 agreement does not constitute an extension of the note, the maturity date of the note, a negotiable instrument, as reflected on the bank's written records, was August 7, 1990, with a four year statute of limitations under Texas law. For reasons explained below, the July 1992 agreement on its face is ambiguous. As a written contract, but not a negotiable instrument, Texas law would impose a four year statute of limitations from July 23, 1992. Presuming application of Texas limitations law with a suit brought in Texas and an ambiguous agreement, PIIGI has rebutted the prima facie presumption of the validity of the claim. The bank therefore has the burden of proving its claim by a preponderance of the evidence.

### An Acknowledgment

New York substantive law applies to this case. The note provides, in part, that "[t]his Note and all transactions hereunder and/or evidenced herein shall be governed by, construed, and enforced in accordance with the laws of the State of New York." Similarly, the loan and security agreement Provides "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York and the substantive laws of the State of New York shall govern the validity, construction, enforcement and interpretation of this Agreement. . . ." The July 1992 agreement likewise provides "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of New York."

The court must determine whether the July 1992 agreement would be classified as an acknowledgment under New York law, triggering a new period of limitations for actions on a contract, but not extending the limitations period for a suit on the note and loan and security agreement, or whether the July 1992 agreement, considered with the parties' subsequent correspondence, would be classified as an extension of the note under New York law, extending limitations for a suit on a negotiable instrument, or whether it is neither.

Under New York law, an acknowledgment of debt creates a contractual promise to pay the old debt. *Lew Morris Demolition Co., Inc. v. Board of Educ. of City of N.Y.,* 40 N.Y.2d 516, 387 N.Y.S.2d 409, 411, 355 N.E.2d 369, 371 (1976). The acknowledgment, as a contractual obligation to pay the old debt, triggers a new period of limitations for a suit on the contract. *See Skaneateles Sav. Bank v. Modi Associates,* 239 A.D.2d 40, 43, 668 N.Y.S.2d 819, 821 (N.Y.1998).

Under New York law, "[a]n acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property." N.Y.Gen.Oblig. § 17–101 (McKinney 1997).

In order for a writing to constitute an acknowledgment sufficient to trigger the statute of limitations running anew, it "must recognize an existing debt and must contain nothing inconsistent with an intention on the part of the debtor to pay it." *Lew Morris Demolition Co.,* 387 N.Y.S.2d 409, 355 N.E.2d at 371; *see also In re Interstate Cigar Co., Inc.,* 171 B.R. 6, 8 (Bankr.E.D.N.Y.1994). New York law does not require that the writing contain a new promise to pay in order to extend the running of the statute of limitations. *Interstate Cigar,* 171 B.R. at 8.

Under New York law, the parties, by contract, may modify a negotiable instrument. 80 N.Y.Jur. § 370 (1989). The agreement may extend the time for payment of the note or renew the negotiable instrument. *Id.* To extend the time for payment of the negotiable instrument, the note, the subsequent agreement must be founded on consideration. *F.D.I.C. v. Hyer,* 66 A.D.2d 521, 528, 413 N.Y.S.2d 939, 944 (N.Y.1979) (analyzing oral agreement). Unless the parties expressly agree to an extension for a definite time, the extension would be for a time not longer than the original period of the instrument. Part payment of the note does not, however, fulfill the consideration requirement. *Id.* A promise to do that which the promisor is already legally bound to do or the performance of an existing legal obligation does not constitute consideration for an extension of a negotiable instrument. *Id.*

In its order denying a motion for partial summary judgment, this court held that the July 1992 agreement, on its face, is ambiguous. In the July 1992 agreement, PIIGI agreed to pay $1,600,000 to the bank in exchange for a release by the bank of the security interest in the 1,000 shares of stock of Professional Investors Life Insurance Company. PIIGI also agreed that "(a) all remaining collateral held by and for the account of [the bank] securing PIIGI's obligations to [the bank] under the Loan Agreement shall continue to secure such obligations and (b) PIIGI shall remain liable to [the bank] for all amounts remaining unpaid and due to [the bank] under, or contemplated by, the Note and Loan Agreement." But the agreement further provides that "[t]his Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and it supercedes and replaces all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof."

Thus, on the one hand, the agreement recognizes PIIGI's liability under the note and loan and security agreement, but, on the other hand, it appears to supercede the prior agreements and constitute the parties' entire agreement. The parties stipulate that the July 1992 agreement, standing on its own, is not a negotiable instrument. The bank contends that the agreement is an acknowledgment, and, when considered in light of the parties' intent and PIIGI's subsequent correspondence with the bank, the agreement extends the note.

During the trial PIIGI raised several issues regarding the bank's evidence concerning this agreement. Since PIIGI rebutted the prima facie validity of the proof of claim, the bank has the burden to prove its claim by a preponderance of the evidence. The bank did not produce a witness who had first hand knowledge of the July 1992 agreement. Rather the bank produced the head of the parent bank's legal department. This witness supervised the bank's review of the agreement before execution. The court permitted his testimony, determining that PIIGI's objection went to the weight of the testimony, not admissibility. PIIGI also objected to a consideration of PIIGI's correspondence to the bank after the execution of the July 1992 agreement. Where an agreement is ambiguous, New York law permits extrinsic evidence, such as the parties' actions, to ascertain the parties' intent in and understanding of the agreement. *See Policastro v. Town of LaGrange,* 193 A.D.2d 950, 953, 597 N.Y.S.2d 794, 796 (N.Y.A.D. 3rd Dept. 1993).

Robert Equey, the director of the parent bank's legal department, testified that the bank did not have its own legal department. As a result, the parent bank's legal department reviewed the bank's documents. He saw drafts of the July 1992 agreement before its execution and discussed the matter with bank personnel, including the person who signed the document for the bank. He testified that the agreement reflects the bank's position and that it protected the bank's interest. The

court understands his testimony to mean that the agreement's reference to being the entire agreement of the parties with regard to this "subject matter" pertains only to the release of the security interest in the PIIGI subsidiary upon partial payment of the debt. Otherwise, PIIGI's liability under the original note and loan and security agreement remained enforceable.

Darrell Jordan, through consulting companies, held an equity interest in PIIGI. He had served on PIIGI's board of directors at the time of the execution of the July 1992 agreement. He testified that he played no role in the agreement; he had no involvement in the negotiation or drafting of the agreement. He did not execute the agreement. Alexander Stone executed the agreement for PIIGI, but he is now deceased. Jordan did not discuss the agreement with any of the bank's personnel.

Jordan testified, however, that he and Stone consulted about PIIGI's affairs on a regular basis. With Stone's failing health, Jordan performed various functions for PIIGI. Jordan, as a member of PIIGI's board in 1993, wrote to Michael Koch at the parent bank on March 30, 1993, requesting that the bank consider restructuring the loan on "some agreed upon basis to extend it for say, a 2 year period, . . . ." He also expressed an interest to pay the balance of the loan at a negotiated discount.

On the same day, Jordan wrote to the parent bank requesting the bank's assistance because of PIIGI's working capital and financing needs. PIIGI could not restructure its financial affairs without resolving its obligation to the bank. On July 16, 1993, Jordan again wrote to the parent bank suggesting that PIIGI would use an anticipated private placement to pay the bank loan. On November 30, 1993, Jordan again wrote the parent bank advising the bank of the status of raising funds to pay the bank loan at a negotiated basis.

On July 6, 1994, Stone acknowledged these efforts, including the request to the parent bank that PIIGI be allowed to pay the debt at a discount. Stone died in 1994. In 1995 Jordan continued his efforts to negotiate terms with the bank.

Jordan testified that PIIGI needed to restructure its financial affairs and could not do so without resolving the obligation to the bank. He testified that he, on PIIGI's behalf, and later on behalf of protecting his equity interest in PIIGI, attempted to negotiate a payoff of the debt at a discount, but was unsuccessful. He faulted the parent bank for failing to respond to these entreaties.

Jordan's communications directly with the parent bank recognize the role of the parent bank and thereby lend credibility to Equey's testimony. Jordan's efforts directed to the parent bank bolster Equey's testimony that the legal department of the parent bank was satisfied that the July 1992 agreement protected the bank's interest. But Equey did not testify that the bank's interest would only be protected by extending the note, as contrasted with an acknowledgment of debt, recognized in New York as a new contractual obligation, and a recognition of the bank's security in the collateral.

Jordan testified that his correspondence to the bank was not intended to address either extending the note or construing the July 1992 agreement as an acknowledgment. However, he testified that he served on the board of directors at that time. He actively sought to extend the note or negotiate a discounted payoff after the execution of the July 1992 agreement. He testified about his frustration at failing to achieve that result with the bank. He testified that he was an experienced investor and consultant who understood financial transactions. Jordan's testimony that he did not seek to extend the note lacks credibility.

Jordan did attempt to extend the note. But he did not offer the bank consideration for an extension. Rather, he requested that the bank restructure the note or ne-

gotiate a discounted payout. The partial payment of the note resulting from the July 1992 agreement does not constitute consideration for an extension. Jordan, whether acting on behalf of PIIGI or his equity interest in PIIGI, or both, did not offer consideration for an extension in the subsequent communications.

Thus, the court finds that the July 1992 agreement's provision that it constitutes the entire agreement between the parties "with respect to the subject matter hereof" and supercedes and replaces all prior agreements "with respect to the subject matter hereof" must be understood to apply to the release of collateral and partial payment which formed the primary reason for entering the July 1992 agreement. In all other respects, PIIGI, in the July 1992 agreement, agreed that it remained liable for the amount remaining on the note with the bank retaining its remaining security interest under the loan and security agreement. The court concludes that this constitutes an acknowledgment under New York law but not an extension of the note under New York law.

Thereafter, PIIGI requested that the bank extend that note's obligations, but offered no consideration for the extension. The bank did not agree to an extension. The court concludes that the July 1992 agreement, considered in light of the subsequent correspondence, does not amount to an extension of the note under New York law.

### Laws of New York, Oklahoma and Texas

In state court, the bank demanded judgment from PIIGI on the note. In this adversary proceeding, the bank has clarified that it bases its claim on the note and on the July 1992 agreement.

Under New York law, "an action upon a contractual obligation or liability, expressed or implied ..." must be commenced within six years. N.Y.C.P.L.R. § 213(2) (McKinney's 1998). A written acknowledgment by a party "imply[ing] a

promise to pay the remainder of the debt" commences a new six year statute of limitations. *Skaneateles Sav. Bank*, 239 A.D.2d at 43, 668 N.Y.S.2d 819. PIIGI executed the acknowledgment on July 23, 1992. The bank filed its complaint on the debt against PIIGI May 7, 1997. Under New York law, the complaint is not barred by the statute of limitations.

Under Oklahoma law, "[a]n action upon any contract, agreement, or promise in writing" must be commenced within five years after the cause of action accrued. Okla.Stat.Ann. tit. 12, § 95(1) (West 1999). "In any cause founded on contract, when any part of the principal or interest shall have been paid, or an acknowledgment of an existing liability, debt or claim, or any promise to pay same shall have been made, an action may be brought in such case within the period prescribed for the same, after such payment, acknowledgment or promise; but such acknowledgment or promise must be in writing, signed by the party to be charged thereby." Okla.Stat. Ann. tit. 12 § 101 (West 1999); *Central Nat'l Bank and Trust Co. v. Stettnisch*, 821 P.2d 1066, 1067 (Okla.Ct.App.1987). PIIGI made a partial payment on July 23, 1992. PIIGI executed a written agreement acknowledging the debt that same day. The underlying obligation had been founded on the note originally executed on November 3, 1986, a contract in writing. Accordingly, under Oklahoma law, the bank's action on May 7, 1997, to collect the debt is not barred by the statute of limitations.

Texas law requires the court to analyze limitations based on the note as a negotiable instrument and based on the July 1992 agreement. Under current Texas law, "[A]n action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date." Tex.Bus. & Comm.Code § 3.118(a) (West 1998). However, before January 1, 1996,

Texas law imposed a four year statute of limitations on promissory notes. Tex.Civ. Prac. & Rem.Code § 16.004 (West 1998) and Tex.Bus. & Comm.Code § 3.118; *Hubert v. Illinois State Assistance Comm'n*, 867 S.W.2d 160, 162 (Tex.App.—Houston [14th Dist.] 1993, reh'g denied). The note matured by its terms no later than September 30, 1987. By agreement, the parties renewed and extended the due date to August 7, 1990, the day after the last maturity date of the obligation according to the bank's records. On April 11, 1991, the bank declared the obligations under the note and the loan and security agreement in default and declared the note immediately due and payable. Under the four year statute of limitations, the action on the note had to have been commenced within four years of the due date. In this case, the due date would have been April 7, 1990. The statute of limitation would have expired on April 7, 1994, before the six year statute of limitations became effective.

But the bank suggests that before limitations ran, the parties entered their July 1992 agreement. Measured from July 23, 1992, the four year statute would not have expired before the six year period became effective. The bank brought its action against PIIGI within six years from July 23, 1992. However, the July 1992 agreement did not extend or state a new due date with respect to the note.

The Texas Business and Commerce Code governs a suit on a note. The article applies to negotiable instruments. Tex. Bus. & Comm.Code § 3.102 (West 1998). The note is a negotiable instrument. But an agreement that is not negotiable does not come within the ambit of § 3.118 of the Texas Business and Commerce Code. The parties stipulate that the July 1992 agreement does not constitute a negotiable instrument. Consequently, the July 1992 agreement does not come within the Texas Business and Commerce Code and thus does not extend the note's due date. Tex. Bus. & Comm.Code § 3.104(b) (West

1998). The Texas four year statute of limitations for suit on a note ran on August 7, 1994, before Texas changed the limitations period to six years. Under Texas law, the bank's action on the note would be barred by the statute of limitations.

■ Under New York law, the July 1992 agreement, while acknowledging the debt, did not extend the note. Had the agreement extended the note, then the Texas limitations on a negotiable instrument would have run from the extended time of payment. But the parties did not extend the negotiable instrument. Thus, a suit on the note under Texas procedural law had to be commenced by August 7, 1994, before Texas changed the limitations period to six years. Under Texas law, the bank's action on the note would be barred by the statute of limitations.

Texas law establishes a four year statute of limitations for action on a written contract. Tex.Civ.Prac. & Rem.Code § 16.004 (West 1998). Under New York law, the July 23, 1992, agreement constitutes an acknowledgment, creating a contractual obligation. Under Texas procedural law, the statute of limitations on the July 23, 1992, written contract ran on July 23, 1996. The bank did not commence its action against PIIGI until May 7, 1997. Consequently, under Texas law, the action brought on the July 1992 agreement is also barred by the statute of limitations.

■ The bank contends, however, that Texas procedural law resurrects the cause of action. The Texas Civil Practice and Remedies Code provides "[i]f a counterclaim or cross-claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross-claim even though as a separate action it would be barred by limitation on the date the party's answer is required." Tex.Civ.Prac. & Rem.Code § 16.069(a) (West 1998).

On April 3, 1996, Davister commenced its action against the bank and PIIGI to declare that PIIGI, not URLIC, owed any

debt to the bank and that the bank engaged in tortious conduct by filing a claim based on the note against URLIC. The bank's cross-claim against PIIGI asserts liability based on the note. The bank contends that its cross-claim is based on the same transaction as Davister's declaratory claim, namely liability on the note.

Under the Texas Rules of Civil Procedure, Rule 97e, a party may state as a cross-claim any claim by one party against a co-party arising out of the same transaction or occurrence that is the subject matter either of the original action or of a counterclaim. The cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the claimant or cross-claimant. *McBryde v. Curry*, 914 S.W.2d 616, 620 (Tex.App.—Texarkana 1995, writ denied). The bank's claim on the note and the July 1992 agreement against PIIGI does not arise from the same transaction or occurrence that is the subject matter of Davister's tort claims against the bank. The tort claims arise from the bank's actions taken in the URLIC liquidation proceedings whereas the bank's claims arise from the note executed by PIIGI and the agreement between PIIGI and the bank entered in July 1992.

But the bank took its actions in the URLIC proceeding because of PIIGI's outstanding obligations and the collateral held by the bank. To address that issue, Davister brought its declaratory claim that PIIGI, not URLIC, held the liability to the bank. That liability arises from the note, the loan and security agreement, and the July 1992 agreement. In turn, the bank brought its cross-claim against PIIGI for liability on the note, loan and security agreement and the July 1992 agreement. PIIGI's liability to the bank under these instruments and agreements is the subject transaction of the declaratory claim of Davister. The bank's claim against PIIGI arises out of the same loan transaction as Davister's declaratory claim against the

bank and PIIGI. PIIGI has not provided this court with any Texas authority holding that the Texas cross-claim procedural rules would not apply to a declaratory action. Consequently, this court holds that § 16.069(a) of the Texas Civil Practice and Remedies Code applies.

PIIGI contends that applying the rule to the bank's cross-claim against it runs counter to the purpose of the rule. Texas enacted § 16.069 "to prevent plaintiffs from waiting to file their claims until the statute of limitations had run on the defendant's potential counterclaims. *Fluor Engineers & Constructors, Inc. v. Southern Pacific Transp. Co.*, 753 F.2d 444, 448 (5th Cir.1985). It gave defendants a 30 day window in which to file those counterclaims." *MBank Fort Worth, N.A. v. Trans Meridian, Inc.*, 820 F.2d 716, 720 (5th Cir.1987). PIIGI did not wait until the bank's statute of limitations ran to file an action against the bank. Nevertheless, Texas Rule of Civil Procedure 97e provides: "A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein." The bank is a party. PIIGI is a co-party. The bank's claim arises out of the loan transaction that is the subject matter of Davister's original declaratory judgment action. The pleading meets the Texas definition of a cross-claim and comes within the plain language of § 16.069. The court has no occasion therefore to look beyond the provision.

PIIGI also argues that Davister brought the declaratory judgment only as a predicate for its tort claim. The court has no reason to surmise Davister's litigation strategy. Davister brought a declaratory judgment to determine PIIGI's liability to the bank on the loan transaction. Having done so, Texas rules permit the bank to file a cross-claim against PIIGI on the loan transaction.

Section 16.069(b) further provides that the cross-claim must be filed not later than

the 30th day after the date on which the party's answer is required. By order entered December 14, 1998, the court directed the parties to either submit a stipulation regarding the timeliness of the cross-claim or provide a copy of the state court docket. The parties submitted the state court docket. By order entered January 14, 1999, the court then invited the parties to submit briefs on the timeliness issue under § 16.069(b).

The Texas procedural rules do not expressly state the date on which a party's answer is "required." However, under Texas Rule of Civil Procedure 99c, "a default judgment may be taken" if an answer is not filed by 10:00 a.m. on the Monday next following the expiration of 20 days after service of the citation and petition. The answer must be "required" on the date that a default judgment could be taken had an answer not been filed. The parties do not appear to contest this proposition.

This time requirement may be interrupted by the filing of a special appearance to challenge personal jurisdiction. Tex. R.Civ.P. 120a. Rule 120a "permits but does not require a defendant to answer when he specially appears." *Rodriguez v. Shell Oil Co.,* 932 F.Supp. 177, 178 (S.D.Tex.1996). If the court overrules the special appearance, then the defendant may appear generally for any purpose. If the court overrules the special appearance, that re-triggers the civil procedural requirements. *Id.*

On May 13, 1996, the bank filed a special appearance and moved to dismiss for lack of personal jurisdiction. On May 13, 1996, the bank also filed a conditional answer subject to the special appearance. The parties do not contend that the bank did not timely file these pleadings before a default judgment could be taken. But because of the special appearance, the default judgment could not be taken and hence the answer had not yet been required. The conditional answer does not become effective unless the court overrules the special appearance. *Id.* at 179.

The state court never overruled the special appearance. But on May 7, 1997, the bank unconditionally filed its amended answer with the cross-claim thereby waiving its special appearance.[1] With the special appearance resolved as a matter of record, the procedural time requirements recommenced to run. With the special appearance resolved, the bank could then appear generally for any purpose. *See Rodriguez,* 932 F.Supp. at 178. The answer would be "required" by the date a default judgment could be taken. Assuming that would be immediately upon resolution of the special appearance, then the answer would be required on May 7, 1997.[2] Section 16.069(b) provides that the cross-claim could be filed within 30 days of the date the answer was required. The bank filed the cross-claim with the answer on May 7, 1997. The bank therefore timely filed the cross-claim under § 16.609(b).

PIIGI moves the court to supplement the record. The bank does not oppose the motion provided the court grants its cross-motion to supplement the record. The parties would present evidence to the court regarding communications between counsel prior to the formal withdrawal or waiver of the special appearance by the

---

1. If the filing of the unconditional answer on May 7, 1997, did not waive the special appearance, then the special appearance has not yet been resolved and an answer not yet "required." *See Dawson–Austin v. Austin,* 968 S.W.2d 319 (Tex.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 795, 142 L.Ed.2d 657 (1999).

2. If the bank's special appearance had been filed before 10:00 a.m. on the Monday next following the expiration of 20 days after service of the petition, the bank's answer would be "required" in the time remaining between the filing of the special appearance and the default time, with that period of time running from the overruling or withdrawal on the record of the special appearance. That method of calculating the "required" answer date harmonizes Rule 99c and Rule 120 and the case law explaining special appearances.

bank. PIIGI argues that the bank had agreed to waive or withdraw its special appearance at an earlier date. Discussions, even agreements, between counsel prior to formal pleading of record or court decree are not relevant. Until the record reflects that the special appearance issue has been resolved, whether by agreement of the parties, waiver, withdrawal or court order, it has not been resolved. The court did not overrule the special appearance. The bank did not, on the record, waive or withdraw the special appearance until May 7, 1997. This court had the record supplemented to reflect the state court docket and then provided the parties with an opportunity to argue the issue. The special appearance raising a jurisdictional issue, the court record dictates when that issue is resolved to trigger procedural rules. A court must be able to consult its record to determine resolution of jurisdictional issues. If parties have resolved a jurisdictional issue, the parties have an obligation to place the resolution on the record to make it effective. The motion and cross-motion to supplement the record are denied.

The court therefore concludes that the bank's cross-claim may be prosecuted against PIIGI under § 16.069, even though otherwise time barred in Texas. Accordingly, under Texas, New York or Oklahoma law, the bank may prosecute the claim against PIIGI.

The bank also argues that the correspondence from PIIGI or Jordan after the July 1992 agreement may be construed as establishing a later contractual arrangement triggering a new limitations period. The parties did not reach any agreement concerning liability on the debt after July 1992. Rather, PIIGI unsuccessfully sought to restructure or retire the debt at a discount.

### Choice of Law

PIIGI contends that the Texas limitations law applies. The bank counters that New York limitations law should apply but, if not, Oklahoma law applies. This issue need only be decided if the court has erroneously concluded that the claim would not be barred under the laws of either Texas or New York or Oklahoma. If a reviewing court decided that the claim would be barred under Texas law, then this court would have to decide which limitations law should be applied. For completeness of ruling, the court turns to that issue.

The bankruptcy court determines the allowance of a pre-petition claim against a bankruptcy estate based on non-bankruptcy law. Prior to the commencement of the bankruptcy case, the bank filed its cross-claim against PIIGI in litigation pending in Texas state court. Having brought that claim against PIIGI in Texas before the bankruptcy case, this court first considers how Texas would have determined the applicable limitations law.

With the litigation pending in Texas, consideration of whether Texas would apply its limitations law or that of another state reflects the general federal court practice to look to the choice of law rules of the state in which it sits. *Long Island Trust Co. v. Dicker*, 659 F.2d 641, 644–45 n. 6 (5th Cir.1981). Texas follows the Restatement (Second) Conflict of Laws for resolving choice of law questions. *Johansen v. E.I. Du Pont De Nemours & Co.*, 810 F.2d 1377, 1381 n. 5 (5th Cir.1987). Under that law, Texas would apply the substantive law of the jurisdiction with the most significant relationship to the facts surrounding the substantive issue to be decided. *Johansen*, 810 F.2d at 1381 n. 5. As the note, security agreement and July 1992 agreement provide for New York law, Texas would apply New York substantive law. *Long Island Trust*, 659 F.2d at 645 n. 6.

But Texas would apply its own procedural law. *Long Island Trust*, 659 F.2d at 645 n. 6. Limitations laws are procedural in both Texas and New York. *Johansen*, 810 F.2d at 1381; *Elghanayan v. Elghanayan*, 190 A.D.2d 449, 453, 598

N.Y.S.2d 524, 527 (N.Y.A.D. 1st Dep't. 1993). Even though New York substantive law would be applied by the Texas court, the Texas court would apply Texas limitations law to suits pending in Texas. *See Hollander v. Capon*, 853 S.W.2d 723, 727 (Tex.App.—Houston [1st Div.] 1993, writ denied). Thus, if Texas limitations law barred the action in Texas, the forum court, no action may be maintained even if the action would not be barred in the state where the action arose. *Id.* The Texas exception to this approach, where Texas courts would consider a limitations period substantive rather than procedural, would apply if the action had been premised on a right created by statute that did not exist at common law and which incorporated a limitation on the time within which a suit must be brought to enforce that right. *Johansen*, 810 F.2d at 1381. The bank's suit on the note and contract reflect causes of action that exist at common law. Therefore, the Texas exception is inapplicable.

▮ Accordingly, the Texas court would apply the Texas statute of limitations. But the bank argues that since the Texas litigation had not been adjudicated by the time of the filing of the bankruptcy petition, the bankruptcy court may take a different approach to the choice of law question. In *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 91 L.Ed. 162 (1946), the Supreme Court held that in determining the allowance of a claim against a bankruptcy estate, the bankruptcy court does not apply the law of the state in which it sits. Rather, the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) would not apply, but the court, instead, should conduct its own choice of law assessment. *Vanston*, 329 U.S. at 162–63, 67 S.Ct. 237. *See also In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992). The bankruptcy court must allow a claim "except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The bankruptcy court determines applicable non-bankruptcy law by examining the equities and the contacts of the transaction and the parties. *See Vanston*, 329 U.S. at 162–63, 67 S.Ct. 237.

At the time PIIGI executed the note, PIIGI maintained its principal office in Tulsa, Oklahoma. Stone, PIIGI's president, executed the note on behalf of PIIGI in New York. The loan and security agreement states that PIIGI has offices in Tulsa. The security agreement provides that in the event of a change of address, notice must be given to the other party. PIIGI has not provided the bank with a change of address. Accordingly, the bank sent correspondence to PIIGI at its Tulsa address. PIIGI executed the loan and security agreement in New York. In 1991 the bank sent its demand letter to PIIGI at PIIGI's Tulsa office.

Stone executed the July 1992 agreement in New York. That agreement provides that any communication or notice to PIIGI be delivered to its Tulsa office, unless designated by notice otherwise. PIIGI has not provided the bank in writing with any other address.

But in March or April 1994, Stone's illness kept him from attending to PIIGI's business. He sent PIIGI's books and records to Jordan in Dallas in May 1994. Stone died in December 1994. PIIGI closed its Oklahoma office in early 1995.

Jordan managed his consulting and investment operations from offices in Dallas and in New Orleans. While an officer and director of PIIGI from 1991 to 1994, Jordan consulted with Stone and performed various services for PIIGI from his Dallas office. Jordan testified that he performed PIIGI's daily business activities from Dallas since 1991. But Jordan could not and did not identify daily business activities actually performed, rather he described several consulting and other services for

PIIGI until the corporate books and records were transferred in 1994.

PIIGI maintained its home office in Tulsa until 1994. Stone maintained the corporate books and records in Tulsa until 1994. PIIGI never leased office space in Dallas and never had employees working in Dallas. Jordan provided office space after 1994. Jordan could not identify a Texas bank account for PIIGI. But Jordan did generate negotiations for PIIGI with the bank and the parent bank from Callas. Personnel of the parent bank communicated with Jordan at his Dallas address.

On April 3, 1996, Davister filed its complaint against PIIGI and the bank in Texas state court. On May 7, 1997, the bank filed its cross-claim against PIIGI in Texas state court. The bank averred at that time that PIIGI's principal place of business was in Dallas.

PIIGI is a Delaware corporation. It maintained its office in Tulsa until 1994. PIIGI had no income from May 1995 until it filed its bankruptcy petition. After sending its books and records to Dallas, PIIGI had no cash, no bank accounts, no accounts receivable, no office equipment, furnishings or supplies, no intellectual property, no licenses or general intangibles, no machinery, fixtures or equipment, no supplies used in business and no inventory located in Texas or elsewhere. In 1997 PIIGI had no daily business operations in Dallas or elsewhere.

Thus, at the time of the Davister suit and the bank cross-claim in Texas, PIIGI maintained, at most, its books and records in Dallas. At all other times material to the debt, PIIGI maintained its office and its operations in Tulsa, Oklahoma. PIIGI executed the note, loan and security agreement and the July 1992 agreement in New York. The note, loan and security agreement and the July 1992 agreement provide that New York law applies.

But the court does not write on a clean slate. The bank's litigation had been commenced pre-petition in Texas state court. But for the bankruptcy petition, the litigation would have proceeded in Texas state court. Texas would have applied its statute of limitations. If the litigation survived limitations, Texas would have applied New York substantive law. That is the posture in which the bank's claim reached this bankruptcy court. Thus, even if this court looks beyond *Erie* to the choice of law approach of *Vanston*, the court would apply Texas procedural law. To do otherwise would ignore the fact of the Texas litigation.

The bank contends that it did not commence that litigation voluntarily but rather felt compelled because of the declaratory action brought against it and PIIGI by Davister. The bank's argument reflects this court's analysis that the cross-claim against PIIGI arises from the same transaction as the Davister declaratory action against the bank and PIIGI, namely, that PIIGI is liable to the bank under the note and loan and security agreement. Had the bank been compelled to file the cross-claim to prevent the invocation of a preclusion doctrine, then the bank would have had limitations resolved by Texas law. If, on the other hand, the bank had a choice and thus voluntarily chose to file the cross-claim in Texas, then Texas procedural law should apply. In assessing the factors for choice of law, the fact of the pre-petition suit in Texas, whether voluntarily or compulsorily filed, carries dispositive weight.

Under the *Vanston* authority, had the bank not filed suit in Texas pre-petition, but merely filed a proof of claim in this bankruptcy case, then this court would have applied New York procedural and substantive law. Without pre-petition litigation, PIIGI's execution of the relevant documents in New York with its stipulation that New York substantive law should govern weighs in favor of New York procedural law, as well. But the comparison would be with Oklahoma, the place of PIIGI's business operations until 1994, more than with Dallas, where books and record

were stored beginning in 1994 and where Jordan conducted communications.

## Limitations Conclusion

The claim is not barred under the laws of Texas, New York or Oklahoma. The court would, however, apply the limitations law of Texas.

## Lien Avoidance

PIIGI contends that if the bank's claim is barred by the statute of limitations, then the claim must be disallowed under the Bankruptcy Code. With a disallowed claim, PIIGI further contends the bank's lien on the URLIC stock must be declared void under 11 U.S.C. § 506(d). The bank counters that under non-bankruptcy law, the bank retains its lien on the stock even if it cannot pursue its claim against PIIGI. Accordingly, the bank contends that it holds an allowed claim against property of the debtor under 11 U.S.C. § 502(b)(1) making § 506(d) inapplicable.

■■■ The court has concluded that the bank's claim on the note and July 1992 agreement is not time barred under Texas procedural law. Nevertheless, for purposes of completeness, the court addresses this issue.

■■■ To determine the meaning of § 506(d), the court invokes its mantra on interpreting the Bankruptcy Code. The words of § 306(d) must be given their plain meaning providing that the result makes the Code coherent and consistent. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Construction of the Bankruptcy Code is a holistic endeavor. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The court must consider the particular statutory language, the design of the statute as a whole and its object and policy. *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). A statute should not be interpreted so as to render another provision or section superfluous or insignificant. *See Woodfork v.*

*Marine Cooks & Stewards Union*, 642 F.2d 966, 970–71 (5th Cir.1981). But where the statutory scheme of the Code is coherent and consistent, the court generally need not inquire beyond the statute's language. *Ron Pair Enterprises*, 489 U.S. at 240–241, 109 S.Ct. 1026.

Section 506(d) provides:

> To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—
>
> (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
>
> (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

If the bank's claim against the debtor had been time barred under non-bankruptcy law, then the claim would not be allowed against the debtor. The disallowance would not be based on § 502(b)(5) or (e) of the Code nor would it be based on the failure of the bank to file a proof of claim under § 501. Thus, PIIGI contends that the lien on the URLIC stock, which "secures a claim against the debtor that is not an allowed secured claim" must be declared "void" under § 506(d).

But the Code defines a claim as a "right to payment," whether secured or unsecured. 11 U.S.C. § 101(5). A lien means a charge against or an interest in property to secure payment of a debt or performance of an obligation. 11 U.S.C. § 101(37). A debt means a liability on a claim. 11 U.S.C. § 101(12). A security agreement means an agreement that creates or provides for a security interest. 11 U.S.C. § 101(50). And a security interest means a lien created by an agreement. 11 U.S.C. § 101(51).

The bank obtained a charge against or an interest in the URLIC stock pursuant to its security agreement with PIIGI. That "lien" secures PIIGI's liability to the bank. PIIGI contractually acknowledged

that security interest in its July 1992 agreement with the bank.

■ The security agreement and the July 1992 agreement provide that New York law applies. Under New York law, a creditor may foreclose a lien on collateral even though the underlying debt is barred by limitations. *See Estate of Amend,* 107 Misc.2d 497, 499, 435 N.Y.S.2d 235, 237 (N.Y.Sur.1980).

PIIGI maintains however that under Texas law, if limitations prevent the collection of the debt, then the lien becomes unenforceable. *Hoarel Sign Co. v. Dominion Equity Corp.,* 910 S.W.2d 140, 144 (Tex.App.—Amarillo 1995, writ denied). PIIGI contends that because the bank brought its claim against PIIGI in Texas state court, Texas remedies should apply. But PIIGI further concedes that had the bank not filed a proof of claim under § 501 of the Code, the lien on the collateral would not be declared void under § 506.

Indeed, had the bank not filed the proof of claim, the lien could not have been avoided by PIIGI. The bank has possession of the stock and has had possession since the parties first entered into the loan and security agreement. PIIGI could not obtain possession of the stock without a court order. Had PIIGI initiated litigation against the bank in this court, as an adversary proceeding, Bankruptcy Rule 7001(1), or in New York, New York law would be applied based on the parties' contractual agreement. The bank would have been allowed to foreclose its lien.

Like the bank, PIIGI must accept the circumstances as they existed on the bankruptcy petition date. The bank brought its cross-claim in Texas state court prepetition. The court has recognized that fact in its assessment of which limitations law to apply. PIIGI did not cross-claim in state court to obtain possession of the stock or to avoid the lien. Rather PIIGI stayed that litigation with its petition. The matter shifted to bankruptcy court.

The claim must be analyzed as of the petition date. PIIGI had not brought a claim for the collateral in Texas. Under the parties' contract, New York substantive law would apply. This court would apply New York law.

Under the Code, the court "shall allow" a claim filed under § 501, "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). For purposes of this analysis, the court assumes that the claim "is unenforceable against the debtor" because of limitations. But, as discussed, the parties' security agreement grants the bank an interest in the URLIC stock until the obligation has been paid. The obligation has not been paid. The security agreement contractually provides that New York law applies and New York law makes the lien enforceable, even if the debt cannot be pursued against PIIGI because of limitations. Thus, the bank retains a claim, a right to payment, enforceable against "property of the debtor," pursuant to the parties' contract and applicable non-bankruptcy law. Congress mandates that the claim against the property of the debtor "shall" be allowed. 11 U.S.C. § 502(b)(1).

Thus, at the petition date, assuming applicable non-bankruptcy law would have recognized a time-barred suit on the note and agreement against PIIGI, there was no claim by PIIGI to avoid the lien under Texas law. PIIGI had no basis to avoid the lien under New York law.

Nevertheless, PIIGI invokes § 506(d) to void the lien. This use of § 506(d) would render § 502(b)(1)'s provision for allowing claims as of the petition date against property of the debtor superfluous and meaningless in this situation. The court may not give § 506(d) a meaning that would result in nullifying another provision of the Code. The provisions must be read coherently, giving meaning to each. The bank

may not have an allowed claim against the debtor, but the bank has an allowed claim against property of the debtor pursuant to the non-bankruptcy law that the parties agreed to apply. Section 506(d) cannot be read to void that lien.

■ The bank recognizes, however, that 11 U.S.C. § 506(a) nevertheless applies. Under § 506(a) the bank's secured claim is limited to the value of its collateral, namely, $615,000. That is the extent of its allowed claim against the bankruptcy estate. The bank's claim against the debtor of $1,807,211.56 would be disallowed, if time barred, but the claim of $615,000 against the property of the debtor would be allowed. Section 506(d) assures that the bank's lien be so limited.

This reading of the Code gives effect to all its provisions. It does not alter non-bankruptcy law. It does not provide a windfall to the debtor merely because the bank elected to participate in the case by filing a proof of claim. It does not penalize the bank for electing to participate in the case except to the extent of being limited to the value of its collateral under § 506(a), which reflects its non-bankruptcy situation in any event if its claim against the debtor is time barred. But it allows the debtor to obtain and use the collateral if it can confirm a plan with a payment of the value of the collateral or with granting replacement collateral pursuant to the Bankruptcy Code.

Ironically, Jordan testified that he had been attempting to engage the bank and its parent bank in negotiations to restructure the note and to pay the debt at a discount. The Bankruptcy Code gives PI-IGI that opportunity since the Code would allow PIIGI to force a restructuring on the bank with a payment limited to the value of the collateral. The claim against the debtor for the greater amount would be disallowed if time barred under non-bankruptcy law, or restructured to an unsecured claim under § 506(a) if not time barred.

The parties recognize that bankruptcy courts have disagreed on the meaning of § 506(d). This court joins those bankruptcy courts that hold that the lien would not be voided under § 506(d) under the facts and circumstances of this case. While the parties may attempt to draw meaning from the Supreme Court's pronouncement in *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), this court reads the Supreme Court's teaching to recognize that the lien survives if allowable under § 502. *Id.* at 417, 112 S.Ct. 773.

Accordingly, this court concludes that even if the bank's claim had been time barred against the debtor under Texas law, the lien on the collateral would be recognized under New York law, as the parties contracted. The bank would have an allowed claim, under those circumstances, against property of the debtor, § 502(b)(1), with the amount of the allowed secured claim determined under § 506(a), and the lien limited to the value of the collateral pursuant to § 506(a) and (d). Under that circumstance, the bank would have an allowed secured claim of $615,000, but no unsecured claim.

### Conclusion

Applying Texas procedural law, the bank's claim is not time barred.

■ IT IS THEREFORE ORDERED that the bank shall have a judgment for an allowed claim of $1,807,211.56, of which $615,000 is an allowed secured claim and the remainder, an allowed unsecured claim.

Counsel for the bank shall submit a form of judgment consistent with this order.